# IN THE UNITED STATES COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

KATHARINA HOLLAND,         )
         )
         **Plaintiff.**         )
         )
**v.**         )       **Case No. 04-0849-CV-W-GAF**
         )
**SAM'S CLUB,**         )
         )
         **Defendant.**         )

## ORDER

Presently before the Court is a Motion for Summary Judgment filed by the Defendant, Sam's Club. (Doc. #75). The Plaintiff, Katharina Holland ("Holland"), opposes this Motion asserting that genuine issues of material fact preclude summary judgment. (Doc. #111). Upon careful consideration of the facts and arguments presented by the parties, the Defendant's Motion for Summary Judgment is GRANTED.

## DISCUSSION

### I.    Facts

Holland filed this action on September 22, 2004. (Doc. #1). The Court granted Holland leave to file an amended complaint which she filed on March 25, 2005. (Doc. #20). In her first amended complaint, Holland asserts five claims:

| | |
|---|---|
| Count I: | 42 U.S.C. § 2000e-5 ("Title VII") - Gender Discrimination |
| Count II: | Title VII - Hostile Work Environment |
| Count III: | Mo. Rev. Stat. § 213.010 et. seq. ("MHRA") - Gender Discrimination |
| Count VI: | MHRA - Hostile Work Environment |
| Count V: | Equal Pay Act, 29 U.S.C. § 206. |

(Doc. #20). Holland also purports to assert retaliation claims in violation of Title VII and the MHRA which

1

were not set forth in her complaint.  (Doc. #77, #111).

Holland began working for the Defendant in Fairbanks, Alaska on July 24, 1996.  (Pl.'s Dep. 272:9-10).  When her husband was transferred to Texas in 1999, Holland requested and was transferred to Temple, Texas.  (Pl.'s Dep. 742:3-6).  Holland began working for the Defendant in Independence, Missouri in October 2001 folding clothing on the day shift.  (Pl.'s Dep. 261:16-23).  On January 23, 2002, Holland was transferred, at her request, to the receiving department as a forklift driver.  (Pl.'s Dep. 271:25-272:5).  On June 3, 2003, following an incident where Holland damaged a freezer door with her forklift, Holland was transferred to a position as a stocker on the night shift in the electronics department.  (Conroy Dep. 144:15-18; Osgood Aff. ¶ 12).  Shortly after being transferred, Holland took medical leave to have knee surgery.  (Pl.'s Dep. 817:1-3).  Holland returned to work in early August 2003.  (Pl.'s Dep. 817:4-8).  In late August or early September 2003, Holland transferred from her position as a stocker on the night shift in the electronics department to a door greeter on the day shift.  (Pl.'s Dep. 818:7-10).  On September 30, 2003, Holland had an "incident" with a customer while working as a door greeter.  (Pl.'s Dep. 333:1-4).  The Defendant terminated Holland's employment on October 6, 2003 for "gross misconduct" related to the incident with the customer.  (Doc. #77, Ex. 65).

## A.    *Threats of Bodily Harm by Co-Worker, Gary Shirley*

Holland claims that a male co-worker, Gary Shirley, threatened her with bodily harm in October or November of 2001 shortly after she began working for the Defendant in Independence, Missouri.  (Pl.'s Dep. 141:12-15).  Gary Shirley never threatened Holland after November of 2001 and, according to Holland, Gary Shirley was fired several months after the alleged threats were made for absenteeism.  (Pl.'s Dep. 139:19-141:20; *See also* Conroy Aff. ¶ 35 ("Mr. Shirley was terminated on April 12, 2002 for job

2

abandonment."); Doc. #77, Ex. 30 (Gary Shirley Exit Interview)). Holland never contacted the police about Gary Shirley's threats. (Pl.'s Dep. 121:5-18). In her deposition, Holland described the nature of Gary Shirley's threats:

> [Gary Shirley] told me that if I caused any problems with any of the guys working nights, that the guys had already – all the co-worker males had already gotten together and they would stand against me and I would be made out to look like a liar. Gary also threatened me that if I caused him any problem personally, that he would have his goombas and his Mexican friends fix me.

(Pl.'s Dep. 551:9-20). Holland claims she told Tom Conroy ("Conroy"), the general manager of the Sam's Club in Independence, Missouri, about Gary's threats:

> . . . I went directly and told Tom that next morning that I was threatened, my family was threatened if I told and I was also told by Gary that if I tried to do anything against any of the guys that worked on night crew that they all had a pact with each other and that they would all stand against me as a liar and I would be –

(Pl.'s Dep. 118:19-25). Holland further testified, "[In my journal,] I left out the threats that were made to me by Gary because I told Tom Conroy the morning after – ." (Pl.'s Dep. 123:22-24). Defendant's counsel questioned Holland about the following journal entry she made two to three months after being threatened by Gary Shirley:

> January 2002 (week 1 and 2). Another year has come and gone. Now we are on the downside of the hill and I'm glad. October, November, December almost burned me completely out. **I wonder what Tom is going to do to Gary.** I truly have been worried with a nut like Gary who drinks and has an explosive temper. He is a loose cannon working at Sam's Club. **If Tom does not do anything soon, I'm going to lose my respect for him as a GM. I cannot for the life of me understand why Tom has not done anything up to this point.** Everybody on the night crew knows about Gary's drinking. Gary has even come to work drunk and was sent home many times (when he shows up for work, and that should have ended his working at Sam's). He whines and cries about the work. He talks bad about Sam's Club. He talks bad about the management, other associates. He is a negative person. **I cannot make heads or tails when Gary threatened to have me killed, rubbed out, taken out, disappeared. It**

3

**has left a very bad taste in my mouth, but I will give Tom another week or so to see what happens and how he is going to handle it.**

(Pl.'s Dep. 128:3- 129:6) (emphasis added).

Approximately two years after the incident, Holland told Pam Spies, the Defendant's Regional Personnel Manager, about Gary's threats of bodily harm on February 11, 2003. (Pl.'s Dep. 543:1-9; 546:18-22). Pam Spies explained to Holland that Holland needed to contact Steve Schrobilgen, Director of Operations in Kansas City, and he would handle her concerns. (Pl.'s Dep. 543:1-9). Holland testifies that she spoke to Steve Schrobilgen on February 12, 2003 about the incident with Gary. (Pl.'s Dep. 480:25-481:4).[1]

### B. Physical Threats with Forklift by Co-Worker, Larry Marks

On January 23, 2002, Holland, at her request, was transferred to a forklift position on the night shift. (Pl.'s Dep. 142:4-7, Conroy Aff. ¶¶ 33-34). Holland admits in her deposition that she had "problems" with one of her co-workers, Larry Marks, who was also a forklift operator. (Pl.'s Dep. 620:12-15). Although Holland states she had no problem with how he did his job, Holland states that he didn't like how she did her job. (Pl.'s Dep. 620:16-22). Holland testified that she and Larry Marks "constantly bickered with each other." (Pl.'s Dep. 620:23-25).

Holland states that she complained to Rob Delpopolo ("Delpopolo"), the night manager, about Larry Marks "being argumentative", "driving the forklift recklessly and dangerously", using "abusive

---

[1]The Defendant contends that Holland did not report Gary Shirley's threats to anyone at Sam's Club until February 2003 when she told Steve Schrobilgen. (Doc. #77, SOF ¶ 55). However, this does not present a disputed *material* fact for trial because it does not affect the Court's decision to grant the Defendant's Motion for Summary Judgment. Therefore, viewing the facts in the light most favorable to Holland, the Court will presume that Holland did report Gary Shirley's threats to Conroy.

4

language", and calling Holland "a bitch." (Pl.'s Dep. 192:21-193:4). Delpopolo allegedly told Holland, "I'm not a babysitter. You're an adult. You work it out yourself. You learn to get along or I will move you." (Pl.'s Dep. 193:5-8). Holland claims she complained to Delpopolo again when Larry Marks allegedly ran into Holland with a forklift. (Pl.'s Dep. 193:9-194:3). Holland gave the following testimony about the incident:

> The next instance we had was again with Larry and he ran into me with a forklift and – or I don't think it was intentional and I think he was trying to scare me but the brakes were not working properly and he called me a bitch again and we had exchanged some words. I went to Rob again and Rob again told me the same thing, he's not here to baby-sit. At that particular instant Larry came up on the forklift to where Rob and I were talking and I was explaining to Rob what Larry had just said to me. Rob turns and looks at Larry and asks Larry, "Did you say this to her and call her a bitch?" And Larry replied to Rob, "Yes, I did. And I did say that to her." Rob's response to Larry was, "You cannot say that. You can't say that to her. You two need to work it out. You need to get along. You work together or I will remove one of you from the receiving area."

Id. Holland felt that Delpopolo was threatening her job with these comments and that she would be removed if the problems between herself and Larry Marks continued. (Pl.'s Dep. 194:3-22). Holland testifies that following this conversation with Delpopolo, she was approached by C.J. Kliebert ("Kliebert"), the receiving manager on the day shift, who told her that she needed to be "as quiet as a church mouse" and should not complaint to Delpopolo or talk to Delpopolo for any reason whatsoever because Kliebert wanted to keep Holland in receiving and working on the dock because she was such a good worker. (Pl.'s Dep. 194:25-195-17).

### C.    Alleged Disparate Treatment in the Punishment for Forklift Accidents

On June 13, 2002, Holland hit a water line while driving a forklift. (Pl.'s Dep. 788:11-789:3). She was "written up" for this accident, i.e. given a "Coaching for Improvement" form, shortly after the accident

5

occurred. (Doc. #77, Ex. 38). The day Kliebert wrote Holland up for her accident, Holland told Kliebert that she was worried that the accident would affect her upcoming annual evaluation. (Pl.'s Dep. 82:9-82:25). Holland states that Kliebert told her not to worry about the evaluation because it would not be affected by her accident. Id.

After being written-up for this accident, Holland claims that she had a conversation with Larry Marks wherein Larry Marks told her that he had not been written up for two accidents he had:

> He [Larry Marks] had already had his two accidents and this was the week I was written up for my first accident with the sprinkler system and we were on break and he told me not to worry about it. He said he was not written up. I asked him why he wasn't written up. He said he didn't know. I said, "You never received any reprimand at all or anything?" He said, "No." I said, "Did you receive any procedures?" He said, "No." Because when you have an accident there's a procedure that is to be followed according to Sam's policy. You are supposed to review a tape and you are supposed to do a couple of other things and Larry never received any of that and I conveyed my feelings and my thoughts to C.J.

(Pl.'s Dep. 85:9-25). Holland testified that she complained to Kliebert about being treated differently because she is a woman:

> I told him [C.J.] that I felt I was being treated unfair because the night Larry had his two accidents there were two managers there Todd and Patrick – Todd was one of the two managers that saw both of those two accidents. When Larry hit the water sprinkler Todd was there and Patrick was there. They saw it. They were in the back when that occurred. They saw him hit the water sprinkler. Todd was on the receiving dock. When Larry went through the door with the forklift and the bale, Todd and Patrick saw him tear the door off and they were both there that night and there were two managers present.

(Pl.'s Dep. 89:18-90:9). When asked again about the incident in her deposition, Holland testified:

> The day after Larry and I were – I found out from Larry that he was not written up. Th very next day, which would have been the very next morning, I confronted C.J. about why Larry wasn't written up and he could offer no explanation. And I told him – and I told C.J. that both Todd and Patrick were present at both accidents that Larry had within three weeks of each other. He had two accidents in three weeks and there were two managers.

6

> Todd and Patrick were there and saw both accidents, why he was – Larry was not written up. He could offer no explanation and he said he did not know and I told him that I felt I was being treated differently because I was a woman and Larry was a guy and he was part of the good old boys' club[2] and I was being chastised and penalized for one accident when Larry had two and I was immediately written up. The very next night I came to work, I received my write-up.

(Pl.'s Dep. 97:11-98:5). Holland claims that when she expressed her complaints about what she perceived as unfair treatment to Kliebert, he reiterated to her that her accident would not affect her evaluation. (Pl.'s Dep. 98:6-9).

Although Kliebert told her that the accident would not affect her annual evaluation, Holland claims that it did as she received a 40 cent, rather than a 50 cent, pay increase.[3] (Pl.'s Dep. 82:15-84:3). Holland was evaluated by Kliebert and Todd Osgood ("Osgood"); Osgood was the merchandising manager and Kliebert's supervisor. (Pl.'s Dep. 83:14-15, 99:11-12; Osgood Aff. ¶2). Holland testified that Osgood

---

[2]The Defendant asserts that sometime in early 2002, Holland spoke with Conroy about what she called the "Good Ole Boys Club" in the receiving department. (Conroy Dep. 277:2-18; Conroy Aff. ¶ 36). Holland discussed how she was having a difficult time earning respect from her male and female co-workers. (Conroy Dep. 277:2-18; Conroy Aff. ¶ 38). Conroy explained how the men and women in receiving worked together for quite some time, had close relationships, and Holland needed to try to work with them and get along. (Conroy Dep. 277:2-18; Conroy Aff. ¶ 39). Holland never stated or implied that she was being discriminated against because of her gender, only that she did not fit in with her female and male co-workers in receiving. (Conroy Dep. 277:2-18; Conroy Aff. ¶ 40).

In the twenty citations to Holland's deposition in response to these facts asserted by the Defendants, the term "good old boys' club" is mentioned only once. The term appears in this passage where Holland complains to Kliebert in June or July of 2002 about what she perceives as unfair treatment based on gender because she was written up for her forklift accident and Larry Marks was not.

[3]According to the Defendants, Holland received a $.40 raise in July 2002, from $9.50 to $9.90 per hour. (Def. SOF ¶ 71).

Case 4:04-cv-00849-GAF   Document 125   Filed 12/21/05   Page 7 of 29

then gave her a 50 cent pay increase because he said he felt Holland was not receiving enough.[4]  (Pl.'s Dep. 84:1-3).  Holland further testified that Osgood stated:

> He also said at the same time he dropped the ball about the accident with Larry, the two accidents with Larry when I presented to him about why Larry was not written up because I had discussed that with C.J.  It's written in those books that I discussed that with C.J., stating that I felt that I was – because Larry had had two accidents and the same two accidents he had I had but he had them within a month of each other and he was never even scolded or written up for those and I had got that from him himself.  I told C.J. that I felt I was being unfairly treated because I was a women and he related that to Todd because Todd said that in the meeting.

(Pl.'s Dep. 84:5-18).

Holland properly reported  forklift accidents involving Larry Marks in early August 2002 and September 15, 2002.  In early August 2002, Larry Marks was given a "Coaching for Improvement Form" after he damaged a $1,000 TV while unloading it from a truck.  (Doc. #77, Ex. 44).  The incident was not reported; Larry Marks stated that he didn't know the TV was damaged.  Id.  On September 15, 2002, Larry Marks damaged a washer when he dropped it from his lift.  (Doc. #77, Ex. 45).  Again, Larry Marks did not report the incident and instead told his manager that the washer was damaged when it arrived.  Id.  On September 20, 2002, Larry Marks was terminated for "insubordination," more specifically, for having too many forklift accidents and failing to report them.  Id.

### D.    Anonymous Profane Threatening Notes

In late September or early October of 2002, Holland began receiving profane threatening notes.

---

[4]According to the Defendants, Holland received a $.50 raise on or about July 24, 2004 from $9.90 per hour to $10.40 per hour.  (Def. SOF ¶ 72).

8

(Pl.'s Dep. 289:25-290:7).[5]  These notes were left on and in Holland's vehicle and in the workspace that Holland shared with other employees.  (Pl.'s Dep. 289:9-10 (note slipped through cracked window of vehicle and found inside Holland's car); Pl.'s Dep. 297:15-18 (note found underneath windshield blade of Holland's car); Pl.'s Dep. 311:9-20) (note found on podium beside a filing cabinet used by Holland and other employees)).  Holland generally discovered the notes either immediately before her shift began or shortly after her shift concluded.  (Pl.'s Dep. 289:24-25 (note discovered in the morning, following Holland's shift); Pl.'s Dep. 297:19-20 (same); Pl.'s Dep. 315:13-16) (note discovered in the evening, when Holland arrived at work).  Holland admits that none of these notes were addressed to her specifically. (Pl.'s Dep. 312:11-12).

Holland speculated in her deposition that the notes were sent by someone on the night crew because the notes referred to the termination of Larry Marks' employment and "everybody knew it was because of me [Holland] that Larry got fired because it was very well known."  (Pl.'s Dep. 302:5-9). Upon receiving a third note, Holland reported to Conroy that she was receiving threatening notes.  (Pl.'s Dep. 316:25-317:14).  Holland does not recall the exact date that she reported the notes to Conroy; however, she believes it was about a month after Larry Marks was fired.  (Pl.'s Dep. 317:15-318:10). Therefore, Holland reported the threatening notes to Conroy in late October or early November 2002.[6]

_____

[5]Holland testified in her deposition that she received the first note "about two or three weeks starting – maybe two weeks after Larry [Marks] got fired."  (Pl.'s Dep. 290:5-6).  According to his exit interview, Larry Marks' employment with the Defendant was terminated on September 20, 2002. (Doc. #77, Ex. 45).  Accordingly, the Court estimates that Holland allegedly began receiving profane threatening notes in late September or early October of 2002.

[6]Later on in her deposition, Holland testified that she told Conroy about the threatening notes in 2003.  (Pl.'s Dep. 523:4; 11-13, 16-19).  Holland then testified that she doesn't remember if she told Conroy about the threatening notes in 2002 or 2003.  (Pl.'s Dep. 524:1-4).  The exact date of when

9

When asked about reporting the threatening notes to Conroy, Holland testified as follows:

> Q: Now, when you told Tom, did you give him copies of the notes?
> A: He didn't ask. He offered no concern.
> Q: So what did you tell Tom?
> A: I told Tom that I was receiving some threatening notes. I said they're telling or saying – accusing me that I got Larry fired and he asked me, he said, "Well, when did this happen?" And I told him and he said, "Well, it's probably somebody just being a jerk." And he said for me not to worry. He said if I feel threatened to come back to him and let him know if I receive any more.
> Q: So is that all you told Tom?
> A: Yes.

(Pl.'s Dep. 320:11-24).[7]

Holland further testifies that after she spoke with Conroy about the notes, she told Delpopolo about them in early 2003. (Pl.'s Dep. 524:13-528:8). Holland states that during a conversation with Delpopolo regarding the how many trucks were coming in, Holland mentioned to Delpopolo that she had received threatening notes after Larry Marks was terminated and she had told Conroy about them.[8] Id.

On February 11, 2003, Holland spoke with Spies about the notes. (Pl.'s Dep. 493:5-10). Holland, upon Spies' recommendation, contacted Schrobilgen about the notes. (Pl.'s Dep. 545:15-24).

_____

Holland told Conroy about the threatening notes is immaterial.

[7]The Defendant contends that Conroy asked Holland to show him the notes and she refused. (Doc. #77, SOF ¶ 92; Conroy Dep. 38:11-39:15). However, this does not present a disputed *material* fact for trial because it does not affect the Court's decision to grant the Defendant's Motion for Summary Judgment. Therefore, viewing the facts in the light most favorable to Holland, the Court will presume that Holland did not refuse to show Conroy the notes.

[8]The Defendant contends that Holland refused to cooperate in any investigation of the notes and told Delpopolo not to discuss the situation with Conroy. (Doc. #77, SOF ¶ 85; Delpopolo Dep. 53:6-54:22). However, this does not present a disputed material fact for trial because it does not affect the Court's decision to grant the Defendant's Motion for Summary Judgment. Therefore, viewing the facts in the light most favorable to Holland, the Court will presume that Holland did not refuse to cooperate in an investigation and did not tell Delpopolo not to discuss the situation with Conroy.

Holland faxed Schrobilgen copies of the notes on February 11, 2003. (Doc. #77, Ex. 56). Holland does not remember the sequence in which she received the notes. (Pl.'s Dep. 289:9-10). Nevertheless, one note provides:

> your turn is coming you talk to [sic] much to the wrong people keep your mouth shut we all know and you will pay you will be sorry accidents happen all the time we [sic] not stupid like you think you are being watched you can be set up why don't you quit and save us the trouble

Id. A second note states, "you got larry fired your turn is next." Id. A third note states, "You stupid bicth [sic] your [sic] going to get fucked we know where you live bicth [sic]." Id. A fourth note states, "Your ass is goin [sic] to get fucked cunt just wait." Id. A fifth note states, "we know you told bitch." Id. Finally, a sixth note states, "stupid bitch youll [sic] get yours." Id.[9] When Holland spoke to Schrobilgen on February 12, 2003, Holland told Schrobilgen that she had told Delpopolo and Conroy about the notes and neither one of them had asked to see them. (Pl.'s Dep. 479:14-16). Holland told Schrobilgen that she believed the notes were written by someone on the night crew.[10] (Pl.'s Dep. 482:20-484:3).

### E. "Bitches in the Back" Comment

Holland told Spies on February 11, 2003 and Schrobilgen on February 12, 2003 that Delpopolo made the statement "keep the bitches in the back" in reference to her and Valerie Melton. (Pl.'s Dep.

---

[9]Holland asserts that she received one additional note, before Larry Marks was fired. This note was not faxed to Schrobilgen and allegedly read, "Wrong parking spot, Dumb Ass." (Pl.'s Dep. 430:25-431:1; note referred to during Pl.'s Dep. as Ex. 45).

[10]The Defendant has presented the Court with the expert testimony of a Certified Document Examiner who opines that the notes were actually written by Holland. (Doc. #77, Ex. 70, 71). However, this does not a present a disputed material fact for trial because it does not affect the Court's decision to grant the Defendant's Motion for Summary Judgment. Therefore, viewing the facts in the light most favorable to Holland, the Court will presume that Holland did not write these profane threatening notes herself.

11

480:4-18; Pl.'s SOF ¶ 69).   According to Valerie Melton, this comment was made to both her and Holland while Melton and Delpopolo were discussing personnel distribution on the floor:

> Well, he had discussed where the guys were working on the floor and which department. Then he discussed receiving and the bitches in the back, so that would have been referring to his personnel distribution and location would have both been summed up in that phrase, the bitches referring to me and Kat [Holland], referring to our department in receiving, which is located in the back of the store.

(Melton Dep. 65:20-69:25).  The Defendant alleges that Holland asserts the "bitches in the back" comment occurred during the first week of February 2003.  (Doc. #77, FN 17).  However, the Defendant fails to cite to the record in support of its allegation.  Id.  Regardless, it is clear that this comment occurred sometime prior to February 11, 2003 as Holland informed Spies of the comment on that date.  Schrobilgen transferred Delpopolo from his supervisory position on the night shift to the day shift after Holland reported this incident.  (Pl.'s SOF ¶ 72, Pl.'s Dep. 57:7-15; 488:2-10).  Holland contends that Delpopolo was not moved from his night shift position to the day shift as a result of her complaints, but rather because he was scheduled to rotate out of the night shift position.  (Pl.'s SOF ¶ 72, Pl.'s Dep. 57:7-12).

### F.    Use of Obscenities "bitch" and "cunt" in the Workplace

Holland asserts that she "was subject to repeated verbal abuse and gender based obscenities of 'bitch' and 'cunt' [were] directed to her by her co-workers, including specifically Larry Marks."  (Doc. #111, ¶ 10).  Holland cites to three portions of her deposition in support of this assertion: 193:1-25, 194:1-25, 195:1-2.  Id.  The cited portions of Holland's deposition relate to the incident outlined above where Larry Marks admitted to calling Holland a 'bitch' after she reported his conduct to Delpopolo.  See, Sec. I(B), supra.  The word "cunt" does not appear in any of the cited portions of Holland's deposition.

### G.    Labeled a "Tattle Tale" by Males on the Night Shift

Holland asserts that she "was labeled a 'tattle tale' by males on the night shift who disliked and excluded her." (Doc. #111, ¶ 39). Holland cites five portions of her deposition in support of this assertion: 97:5-25, 98, 194:1-25, 195:1-17, 213:1-6. Id. This assertion is not supported by the evidence as the phrase "tattle tale" does not appear in any of the cited portions of Holland's deposition and the only male co-worker who is mentioned is Larry Marks.

### H.     Holland's Work History as a Forklift Operator at Sam's Club

Holland began working the night shift as a forklift operator in the receiving department at the Sam's Club in Independence, Missouri on January 23, 2002. (Pl.'s Dep. 271:25-272:5). On June 13, 2002, Holland had her first accident wherein she hit a water line while driving the forklift. (Pl.'s Dep. 788:11-789:3). Consequently, she was "written up" for this accident, i.e. given a "Coaching for Improvement" form.[11] (Doc. #77, Ex. 38).

Holland received her first annual evaluation as an employee at the Independence, Missouri Sam's Club on June 27, 2002. (Doc. #77, Ex. 39). Holland was instructed that she "needs to stand back at times and either take direction or re-think what she is planning to do." Id. Holland was further instructed that she "needs to demonstrate work habits that help to prevent injury or loss." Id. As a result of this evaluation, Holland's pay was increased $.40 from $9.50 to $9.90 per hour. Id. Shortly after her annual evaluation, on July 2, 2002, Holland received an "Associate's Commendation Form" which states: "Kat has been a very dependable associate and an asset to the night crew. She is a conscientious associate and strives to do her best each day." (Doc. #77, Ex. 41). Consequently, Holland's pay was increased from

---

[11]A "Coaching for Improvement" form is given when an Associate's behavior (job performance or misconduct) fails to meet the Company's expectations. (Doc. #77, Ex. 11; Conroy Dep, 218:7-10).

$9.90 to $10.40 per hour.  Id.

On January 7, 2003, Holland was given a written Coaching for Improvement form for failing to take lunch breaks.  (Pl.'s Dep. 808:16-23; Doc. #77, Ex. 51).  According to the form, Holland's next level of coaching, for any disciplinary matter, was a "decision making day."[12]  (Doc. #77, Ex. 51).

Holland was given a decision making day on February 10, 2003 for improperly unloading a shipment.  (Pl.'s Dep. 693:9-24; Doc. #77, Ex. 52).  The Defendant would have incurred $946.40 in shipment penalties if Holland's error had gone undetected.  (Doc. #77, Ex. 52).  Holland was aware that the next level of corrective action was termination.  Id.[13]

On June 3, 2003, Holland was involved in a forklift accident where she damaged a freezer doorframe.  (Pl.'s Dep. 175:9-23, 697:25-698:20, 791:3-22).  Even though Holland was aware that the next level of corrective action was termination, she was not terminated but rather was removed from her duties of operating a forklift and transferred to a stocker position in the electronics department on the night shift.  Id.; (Conroy Dep. 144:15-18; Osgood Aff. ¶ 12).  Conroy made the decision to remove Holland from the forklift due to her prior accidents.  (Conroy Dep. 144:5-21, 226:23-227:8).  Holland received no loss in pay or benefits when she began working as a stocker in electronics.  (Conroy Aff. ¶ 87; Osgood Aff. ¶ 15).  Holland testified in her deposition that she wrote the following about her stocker position in her journal: "Well, it is different being a stocker without a lift.  It's training [sic] and yet really fun.  I like it.  No

_____

[12]A "decision making day" or "D-Day" is when an Associate is paid for a day-off to reflect and thing about how he or she can improve his or her performance and do his or her job better.  (Kliebert Dep. 61:15-62:1; Delpopolo Dep. 47:5-12).

[13]The Court notes that Holland called Spies to complain about her perceived inequities in treatment on February 11, 2003, the day after Holland received this decision making day for improperly unloading a shipment.  (Pl.'s Dep. 694:20-22).

14

stress and no responsibility." (Pl.'s Dep. 620:4-8). When asked about the validity of the statement, Holland responded, "It was no stress, yes, and that was fun to me, yes." (Pl.'s Dep. 620:9-11).

On June 4, 2003, Holland received her annual evaluation. (Doc. #77, Ex. 58). Holland was instructed that she needed to "continue to strive to make decisions that do not negatively impact team work, i.e., do not do something if you know it upsets or aggravates an associate." (Id., Pl.'s Dep. 811:21-813:1). Holland admits she was told she needed to improve her decision-making skills, her sensitivity, and her teamwork skills. Id. Based on this evaluation, Holland's pay was increased $.40 per hour to $10.80 per hour. (Doc. #77, Ex. 58; Pl.'s Dep. 811:4-12).

**I.     Summary of Holland's Wages**

When Holland began working at the Sam's Club in Independence, Missouri in October 2001 as a clothes folder on the day shift she was paid $9.30 per hour. (Doc. #77, Ex. 28). She received a $.10 raise in late November, raising her wage to $9.40 per hour. Id. In mid-December, she received another $.10 raise, increasing her pay to $9.50 per hour. Id. In late July 2002, when she was working as a forklift operator on the night shift, Holland began earning $10.40 per hour, reflecting a $.90 pay raise. Id. In early August 2003, Holland was working as a stocker in the electronics department and received a $.40 increase in pay during her annual review, raising her wage to $10.80 per hour. Id. In late August 2003, her wages increased $.50 to $11.30 per hour. Id. She continued to earn $11.30 per hour until the termination of her employment on October 6, 2003. Id.

**J.     *Wages of Comparative Workers***

Exhibit #66, attached to the present Motion, depicts the names of thirty-seven employees of Sam's Club in Independence, Missouri, their respective positions, employment status, hiring date, starting pay rate,

pay rate during the time Holland worked at Sam's Club in Independence, Missouri and a cursory description of each employee's "experience/reasons for pay rate." (Doc. #77, Ex. 66). Holland claims that ". . .the summary, alone, provided by Defendant, Exhibit 66 establishes Plaintiff's claim [under the Equal Pay Act]." (Doc. #111).

### K.    Holland's EEOC/MHRC Charge of Discrimination

On January 2, 2004 Holland filed a charge of discrimination with the EEOC. (Doc. #77, Ex. 47; Doc. #111, Ex. 18A). In this administrative charge, Holland alleges that she was discriminated against based on "sex" and "retaliation." Id. Holland attached a statement of facts to the charge in which she detailed the threats of bodily injury, her confrontations with Larry Marks, her perceived disparate treatment in discipline between men and women involved in forklift accidents, the anonymous threatening notes she received and the "bitches in the back" statement by Delpopolo. Id. She sets forth additional facts that are not germane to the Court's decision in this case.

### L.    Holland's Argument

Holland contends that these facts support her claims for gender discrimination, hostile work environment and retaliation in violation of both Title VII and the MHRA. Holland argues that genuine issues of material fact exist which preclude summary judgment: "Every material fact is disputed material [sic] on each claim making summary judgment inappropriate." (Doc. #77). Holland asserts that the Defendant's "lengthy statement of claimed undisputed facts inaccurately portrays the record" and "a full review of the pleadings, depositions, documents produced in discovery and pleadings [sic] show that facts claimed as undisputed by Defendant are, in fact, disputed by most witnesses, including Defendant's own witnesses." Id. Finally, Holland asserts that Exhibit 66, standing alone, establishes a prima facie claim under the Equal

16

Pay Act. Id.

### M. The Defendant's Argument

The Defendant argues that it is entitled to summary judgment because Holland's Title VII hostile work environment claim and all of her MHRA claims are time barred. (Doc. #77). The Defendant further argues that the facts do not support a prima facie claim of hostile work environment because Holland has failed to prove that she was subject to unwelcome harassment based on her sex and that the alleged harassment affected a term or condition of her employment. Id. The Defendant contends that summary judgment is proper on Holland's gender discrimination claims because the facts fail to support a prima facie case, the Defendant had a legitimate, non-discriminatory reason for its decision to transfer Holland and Holland failed to demonstrate that the Defendant's proffered reason was pretextual. Id. Furthermore, the Defendant asserts that Holland has failed to establish a prima facie claim of retaliation because the Defendant's decision to transfer Holland from a position as a forklift driver to a stocker in the electronics department does not constitute an adverse employment action. Id. Finally, the Defendant contends that Holland has failed to present sufficient evidence that she and her male co-workers performed "equal work" as required by her Equal Pay Act claim.

## II. Standard

The Defendant filed this Motion for Summary Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. According to this Rule, summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering this Motion, the Court views all facts in the light most

17

favorable to Holland and gives her the benefit of all reasonable inferences. *See* Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997). The Court will not weigh the credibility of the evidence, but rather will focus on whether a genuine issue of material fact exists for trial. Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978).

The Defendant bears the burden of proving the absence of disputed material facts. *See* Prudential Ins. Co., 121 F.3d at 366. The burden then shifts to Holland to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If Holland fails to establish a factual dispute on an essential element of their case, the Court will proceed to determine whether the Defendant is entitled to judgment as a matter of law. *See* E.E.O.C. v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001).

An issue of material fact is "genuine" if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). When the evidence supports conflicting conclusions, a *genuine* issue of material fact exists and summary judgment should be denied. Kells v. Sinclair Buick—GMC Truck, Inc., 210 F.3d 827 (8th Cir. 2000) (emphasis added). The "materiality" of a disputed fact is determined by the substantive law governing the claim. Anderson, 477 U.S. at 248. "Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) *citing* Anderson, 477 U.S. at 248.

The summary judgment rule is intended "to isolate and dispose of factually unsupported claims" and should be applied to accomplish this purpose. Prudential Ins. Co., 121 F.3d at 366. In the interest of promoting judicial economy, summary judgment should be granted to prevent the trial of cases lacking a genuine issue of material fact. Inland Oil and Transp. Co. v. U.S., 600 F.2d 725, 728 (8th Cir. 1979).

18

### III.    Analysis

**A.    *Holland's Title VII claim for hostile work environment is not actionable because Holland failed to timely file an administrative charge with the EEOC.***

As a prerequisite to maintaining a cause of action under Title VII, Holland must file a timely administrative charge with the EEOC as required by 42 U.S.C. § 2000e-5(e)(1).  Pursuant to 42 U.S.C. § 2000e-5(e)(1), Holland must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred."  The Supreme Court requires "strict adherence to the procedural requirements specified by the legislature" in 42 U.S.C. § 2000e-5(e) in order to "guarantee evenhanded administration of the law."  National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 108 (2002) *quoting* Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980).  The Court  has further noted that "[b]y choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination."  National Railroad, 536 U.S. at 109 *quoting* Mohasco, 447 U.S. at 825.

Holland filed her EEOC charge of discrimination on January 2, 2004.  Pursuant to 42 U.S.C. § 2000e-5(e)(1), only conduct that occurs within 300 days of the EEOC filing is actionable.  Accordingly, when a charge is filed on January 2, 2004, only conduct occurring on or after March 8, 2003 is actionable.  Here, Holland alleges that she was subjected to a hostile work environment based on gender in violation of Title VII while employed by the Defendant in Independence, Missouri.  Holland contends that a male co-worker threatened her with bodily harm; another male co-worker called her a "bitch" and physically threatened her while operating a forklift; a male co-worker was not written up for his forklift accidents whereas Holland was disciplined for hers; she received anonymous profane threatening notes; and her

19

supervisor on the night shift made the statement "keep the bitches in the back." Holland reported all of these incidents to Pam Spies, the Defendant's Regional Personnel Manager, on February 11, 2003 and Steve Schrobilgen, Director of Operations in Kansas City, on February 12, 2003. All of the evidence which Holland alleges supports her Title VII hostile work environment claim occurred before February 11, 2003. As she filed her charge with the EEOC on January 2, 2004, this conduct is not actionable as it is outside of the 300-day statute of limitations.

Holland contends summary judgment is not appropriate because genuine issues of material fact exist for trial. Holland argues, "Plaintiff does not claim that the last hostile act was the February 2003 comment by Delpopolo. On the contrary, she claims that there were many acts, thereafter, and inactions, as well, that were part of the continuing pattern of a hostile work environment." (Doc. #111). Holland further asserts that she "alleges acts of discrimination within . . . 300 days of filing her charge" and "there is a disputed issue of fact regarding Plaintiff's last claimed act of discrimination and her testimony on that issue." Id. Pursuant to Fed. R. Civ. P. 56(e), Holland bears the burden of setting forth specific facts showing that there is a genuine issue of material fact for trial. Holland fails to identify any affirmative conduct or inaction by the Defendant occurring after February 11, 2003 which supports her Title VII claim of hostile work environment. The record is entirely bare of incidents which occurred after February 11, 2003 which establish a hostile work environment. As Holland has failed to articulate a single instance of alleged discrimination which occurred within the 300-day statutory time period, her Title VII claim of hostile work environment is not actionable.

Holland further contends that a Title VII hostile work environment claim is an ongoing violation and therefore, she may recover for acts which occurred outside of the limitations period. Holland is correct that

20

a hostile work environment claim, by its very nature, involves repetitive conduct and therefore, occurs over a series of days or perhaps years. *See* <u>National Railroad</u>, 536 U.S. at 115. However, to recover for component acts of a hostile work environment claim that fall outside the statutory time period, an act contributing to the claim must occur within the filing period. <u>National Railroad</u>, 536 U.S. at 117. Here, Holland has failed to prove that any affirmative conduct or inaction by the Defendant that created a hostile work environment occurred within the statutory time period. Therefore, Holland has failed to prove that a hostile work environment existed within the 300-day statutory time period. Accordingly, Holland's Title VII claim for hostile work environment is not actionable because Holland failed to timely file an administrative charge with the EEOC.

### B. Holland's MHRA claims are not actionable because Holland failed to timely file an administrative charge with the MCHR.

Similarly, as a prerequisite to maintaining a cause of action under the MHRA, Holland must timely file an administrative charge with the Missouri Commission on Human Rights ("MCHR") as required by Mo. Rev. Stat. § 213.075. Pursuant to Mo. Rev. Stat. § 213.075, Holland must file a charge with the MCHR "within one hundred eighty days of the alleged act of discrimination."

Holland filed her EEOC charge of discrimination on January 2, 2004. The EEOC dually filed the charge with the Missouri Commission on Human Rights ("MCHR"). Therefore, the earliest date the charge could have been filed with the MCHR was the same date it was filed with the EEOC, or January 2, 2004. Pursuant to Mo. Rev. Stat. § 213.075, only conduct that occurs within 180 days prior to the MCHR charge being filed is actionable. Accordingly, when a charge is filed on January 2, 2004, only conduct occurring on or after July 6, 2003 is actionable.

21

As noted above, all of the evidence which Holland alleges supports her MHRA hostile work environment claim occurred before February 11, 2003. Holland fails to identify any affirmative conduct or inaction by the Defendant occurring after February 11, 2003 which supports her MHRA claim of hostile work environment. Accordingly, for the reasons set forth more completely in Sec. III(A), *supra*, Holland's claim of hostile work environment under the MHRA is not actionable as she fails to present any evidence of acts occurring within the 180-day statutory time period in support of her claim.

Similarly, Holland's MHRA claims of gender discrimination and retaliation are not actionable because Holland has failed to present any evidence of discriminatory acts occurring within the 180-day statutory time period. Holland concedes that her termination was not discriminatory. (Doc. #111). Rather, Holland claims that "the heart of Plaintiff's gender discrimination claim is that she was disciplined differently when accused of the same or similar conduct than were similarly situated male employees." Id. Similarly, Holland claims that she was disciplined more harshly than male employees in retaliation for reporting alleged unlawful conduct to Spies and Schrobilgen. Id. This allegedly inequitable discipline eventually caused Holland to be transferred from her position as a forklift operator to a position as a stocker in the electronics department. Id.

The only evidence Holland has presented of this allegedly disparate treatment in discipline involves Larry Marks. Holland contends that she was written up for forklift accidents whereas Larry Marks was not. Larry Marks was terminated for having too many forklift accidents and failing to report them on September 20, 2002. Holland's last forklift accident occurred on June 3, 2003. She was written up for that accident on the same day and then transferred to a stocker position in the electronics department. Holland has failed to present any evidence of disparate discipline within the 180-day statutory time period.

22

Accordingly, Holland's claim of gender discrimination and retaliation in violation of the MHRA is not actionable as she fails to present any evidence of discriminatory acts occurring within the 180-day statutory time period in support of her claim.

### C. Holland has failed to present evidence to support a prima facie claim of gender discrimination in violation of Title VII.

In addition to Holland's claim of gender discrimination in violation of the MHRA, which is not actionable because Holland failed to file a timely administrative charge, Holland also asserts a claim of gender discrimination in violation of Title VII.[14]  As noted above, Holland does not believe that her termination for "gross misconduct" on October 6, 2003 constituted gender discrimination.  Rather, Holland contends that the discipline she received for her three forklift accidents constitutes unlawful discrimination because she was disciplined when her male co-workers were not. To the extent that the Defendant based its decision to transfer Holland on these disciplinary actions,[15] Holland claims the proffered rationale for her transfer was pretextual.

A plaintiff in a gender discrimination case can survive summary judgment in one of two ways: (1)

_____

[14]Holland asserts concomitant claims for gender discrimination arising under both Title VII and the MHRA.  Courts analyzing alleged violations of the MHRA follow the federal courts' authority interpreting analogous Title VII claims.  *See* Gipson v. KAS Snacktime Co., 171 F.3d 574, 578 (8th Cir. 1999).  Accordingly, in addition to Holland's MHRA gender discrimination claim being time barred, it also fails for the same reasons her Title VII gender discrimination claim fails, i.e. the facts fail to support a prima facie claim of gender discrimination.

[15]Holland was disciplined for a forklift accident that damaged a freezer door on June 3, 2003 and was consequently transferred to a stocker position on the same day.  As Holland filed her charge of discrimination with the EEOC on January 2, 2003, within 300 days of the alleged unlawful employment practice,  Holland's claim of gender discrimination in violation of Title VII is not time barred by 42 U.S.C. § 2000e-5(e)(1).

Case 4:04-cv-00849-GAF   Document 125   Filed 12/21/05   Page 23 of 29

by producing direct evidence of discrimination; or (2) by "creating the requisite inference of unlawful discrimination" through the McDonnell Douglas three-step burden shifting analysis. Russell v. Kansas City, Missouri, 414 F.3d 863, 866-67 (8th Cir. 2005). Here, Holland does not contend that there is direct evidence of discrimination on the record.

In the absence of direct evidence of discrimination, Holland can survive summary judgment by creating the requisite inference of unlawful discrimination through the McDonnell Douglas three-step burden-shifting analysis. Russell, 414 F.3d 866-67. In the first stage of the McDonnell Douglas analysis, Holland bears the burden of establishing a prima facie case of discrimination. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If Holland presents facts sufficient to support a prima facie case, then the burden shifts to the Defendant to rebut Holland's prima facie case by articulating legitimate, non-discriminatory reasons for its actions. *See* Id. If the Defendant meets its burden, Holland must show that the Defendant's explanation for its action was merely pretextual. *See* Hossani v. Western Missouri Medical Center, 97 F.3d 1085, 1088 (8th Cir. 1996). To establish a prima facie case of unlawful gender discrimination, Holland must demonstrate that (1) she is a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from other similarly situated males. *See* Hesse v. Avis Rent-A-Car Sys., Inc., 394 F.3d 624, 631 (8th Cir. 2005).

Here, Holland argues that she suffered an adverse employment action when she was transferred from her position as a forklift operator to a stocker in the electronics department. The Defendant contends that this is not an "adverse employment action." An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage." Sallis v. Univ. of Minn., 408 F.3d

24

470, 476 (8th Cir. 2005). "Termination, reduction in pay or benefits and changes in employment that significantly affect an employee's future career prospects" satisfy this standard. <u>Sallis</u>, 408 F.3d at 476. However, "minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities" do not constitute an adverse employment action. <u>Id</u>. Therefore, "not everything that makes an employee unhappy is an actionable adverse action." <u>Fenney v. Dakota, Minnesota & Eastern Railroad Company</u>, 327 F.3d 707, 717 (8th Cir. 2003) *quoting* <u>Montandon v. Farmland Indus., Inc.</u>, 116 F.3d 355, 359 (8th Cir. 1997). Based on the foregoing, the Eighth Circuit has found that "a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's working conditions with no reduction in pay or benefits." <u>Fenney</u>, 327 F.3d at 717 *quoting* <u>Brown v. Lester E. Cox Med. Ctrs.</u>, 286 F.3d 1040, 1045 (8th Cir. 2002) *citing* <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144 (8th Cir. 1997).

Here, Holland was transferred from her position as a forklift operator to a position as a stocker in the electronics department. She worked the night shift in both positions. She suffered no change in benefits or salary as a result of the transfer. In fact, within a few weeks of the transfer, Holland's wages increased $.90 per hour to $11.30. Holland has not presented any evidence that this transfer significantly impacted her future career prospects. Holland testified in her deposition that she enjoyed the stocker position, found it to be free from stress and responsibility, and thought it was fun. As Holland did not suffer an adverse employment action when she was transferred from a forklift operator position to a stocker in the electronics department, Holland has failed to set forth a prima facie case of discrimination. Accordingly, the Defendant is entitled to Summary Judgment on Holland's Title VII gender discrimination claim.

**D. *Holland has failed to present evidence to support a prima facie claim of***

Case 4:04-cv-00849-GAF   Document 125   Filed 12/21/05   Page 25 of 29

*retaliation in violation of Title VII.*

In addition to Holland's claim of retaliation in violation of the MHRA, which is not actionable because Holland failed to file a timely administrative charge, Holland also asserts a claim of retaliation in violation of Title VII.[16] To establish a retaliation claim in violation of Title VII, Holland must prove that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). As analyzed more completely in Sec. III(C), *supra*, Holland has failed to prove that being transferred from her position as a forklift operator on the night shift to a position as a night shift stocker in the electronics department was an "adverse employment action." Accordingly, Holland has failed to establish a prima facie claim of retaliation in violation of Title VII.

Holland contends that "written discipline may be the basis for a retaliation claim where it is subsequently used as a basis for a material change in the terms of employment" and cites in support LaCroix v. Sears, Roebuck and Co., 240 F.32d [sic] 688, 692 (8th Cir. 2001). In LaCroix, the Eighth Circuit affirmed a district court's finding that an employee failed to present a prima facie claim of retaliation because she failed to demonstrate how the unfavorable performance review she received resulted in a "material employment disadvantage." LaCroix, 240 F.3d at 692. Here, Holland asserts that the discipline she received as a result of her forklift accidents constitutes unlawful retaliation. However, Holland has

---

[16]Holland asserts concomitant claims for retaliation arising under both Title VII and the MHRA. Courts analyzing alleged violations of the MHRA follow the federal courts' authority interpreting analogous Title VII claims. *See* Gipson v. KAS Snacktime Co., 171 F.3d 574, 578 (8th Cir. 1999). Accordingly, in addition to Holland's MHRA retaliation claim being time barred, it also fails for the same reasons her Title VII retaliation claim fails, i.e. the facts fail to support a prima facie claim of gender discrimination.

26

failed to prove that the discipline she received as a result of her forklift accidents resulted in a "material change in the terms of employment." It is undisputed that the forklift accidents caused Holland to be transferred from her position as a forklift operator to a position as a stocker in the electronics department. However, the Court has already found that this is not an "adverse employment action." Similarly, the Court finds that Holland's transfer did not result in a "material employment disadvantage" because her salary, benefits and hours did not change. The Defendant, therefore, is entitled to Summary Judgment on Holland's claim for retaliation in violation of Title VII.

> **E. Holland has failed to present sufficient evidence to submit her Equal Pay Act claim to a jury.**

Holland contends that she was paid less than her male co-workers for equal work on jobs requiring equal skill, effort and responsibility in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d). The Equal Pay Act prohibits employers

> . . . from discriminating between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions . . .

29 U.S.C. § 206(d)(1). In EPA litigation, "[t]he plaintiff has the burden of proving that the jobs involve 'equal work.'" Lawrence v. CNF Transportation, Inc., 340 F.3d 486, 491 (8th Cir. 2003) *quoting* Krenik v. County of Le Sueur, 47 F.3d 953, 960 (8th Cir. 1995). "'Equal' means 'substantially equal,' male and female jobs may be compared even if they are not identical." Orahood v. Bd. of Trustees of University of Arkansas, 645 F.2d 651, 654 (8th Cir 1981). "Whether two jobs are substantially equal 'requires a practical judgment on the basis of all the facts and circumstances of a particular case.'" Lawrence, 340

Case 4:04-cv-00849-GAF   Document 125   Filed 12/21/05   Page 27 of 29

F.3d at 492 *quoting* <u>Hunt v. Nebraska Pub. Power Distr.</u>, 282 F.3d 1021, 1029 (8th Cir. 2002). "Application of the Equal Pay Act depends not on job titles or classifications, but on the actual requirements and performance of the job." <u>Lawrence</u>, 340 F.3d at 492 *quoting* <u>EEOC v. Universal Underwriters Ins. Co.</u>, 653 F.2d 1243, 1245 (8th Cir. 1981).

Here, the Defendant contends that Holland has failed to present sufficient evidence for a reasonable jury to conclude that Holland and her male co-workers were performing "equal work." Holland contends that Exhibit 66 to the Defendant's Motion, standing alone, establishes Holland's Equal Pay Act claim. Exhibit 66 provides the following information: (1) the names of 37 employees who worked at the Sam's Club in Independence, Missouri from 2001-2003; (2) their respective job titles; (3) their current employment status; (4) their hire dates; (5) their starting pay rates; (6) their pay rates during the time Holland was employed by Sam's Club in Independence, Missouri; and (7) experiences/reasons for pay rate. (Doc. #77, Ex. 66). With respect to "experience/reasons for pay rate," the document provides two to seven words for each employee such as "prior stocker," "Team leader, now depart. manager," and "Forklift Maint./Skilled Trade; prior stocker/forklift." These cursory descriptions of the employee's prior experience are insufficient for a reasonable jury to determine whether or not Holland and these employees performed "equal work." Proof for an Equal Pay Act claim cannot rest on "job titles or classifications," but rather requires evidence of the "actual requirements and performance of the job."

This document does not provide any information on the skill, effort or responsibility level related to each employee's work. It does not provide a job description for each employee's position. It does not specify the shift worked by the employee. It does not reveal the extent of the employee's supervisory responsibilities or their financial or decision making authority. Holland has failed to offer any evidence of

28

the actual requirements and performance of these jobs to establish that she and her male co-workers performed "equal work." Accordingly, Holland lacks the requisite evidence to submit her Equal Pay Act to a jury.

## CONCLUSION

Holland's Title VII claim for hostile work environment is not actionable because Holland failed to establish that any actionable conduct occurred within the 300-day statutory period. Similarly, Holland's MHRA claims for hostile work environment, gender discrimination and retaliation are not actionable because Holland failed to present any evidence of actionable conduct occurring within the 180-day statutory period. Holland has failed to establish a prima facie case of gender discrimination in violation of either Title VII or the MHRA because her transfer from being a forklift operator to being a stocker in the electronics department does not constitute an adverse employment action. Holland's retaliation claims under both Title VII and the MHRA fail for the same reason. Finally, Holland failed to present sufficient evidence demonstrating that she and her male co-workers performed "equal work" to allow her Equal Pay Act claim to be submitted to a jury. Accordingly, the Defendant's Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: December 21, 2005

29